[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-14213

_____

RMS OF GEORGIA, LLC,
d.b.a. Choice Refrigerants,

                                                                    Petitioner,

*versus*

U.S. ENVIRONMENTAL PROTECTION AGENCY,
ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION
AGENCY,

                                                                    Respondents.

_____

Petition for Review of a Decision of the
Environmental Protection Agency

Agency No. EPA-2021-21942-55841

———————————————

Before WILSON, BRASHER, and MARCUS, Circuit Judges.

WILSON, Circuit Judge:

Congress gave the Courts of Appeals jurisdiction to hear petitions for review of Environmental Protection Agency (EPA) actions under the Clean Air Act. 42 U.S.C. § 7607(b)(1). But it mandated that petitions for review of "nationally applicable" actions be heard in the Court of Appeals for the District of Columbia Circuit (D.C. Circuit), while petitions for review of "locally or regionally applicable" actions should be heard in the regional circuit Courts of Appeals. *Id.* Our task today is to determine which type of action this petition challenges.

Petitioner RMS of Georgia d/b/a Choice Refrigerants (RMS) challenges the EPA's allocation of permits to consume hydrofluorocarbons—a type of chemical refrigerant—under the American Innovation and Manufacturing Act. Pub. L. No. 116-260, Div. S., § 103, 134 Stat. 1182, 2255–71 (2020) (codified at 42 U.S.C. § 7675). RMS argues that it received fewer permits than it was entitled because the EPA improperly allocated some historic HFC usage to RMS's competitors. However, because we hold that the EPA's action, was nationally applicable we **TRANSFER** this petition to the D.C. Circuit for further consideration.

## I.

The United States has been a site of rapid innovation in the field of refrigeration technology since the mid-nineteenth century. In the 1840s, Dr. John Gorrie of Apalachicola, Florida invented one of the world's first mechanical refrigeration systems to soothe his patients' malaria-induced fevers in the Florida panhandle. By the early 1900s Carrier Engineering of New York was installing similar mechanical refrigeration systems to cool enormous auditoriums and theaters. While these early machines relied on water and compressed air, these systems gave way to those relying on volatile and toxic chemicals such as ammonia. But in 1928, Thomas Midgley Jr. at the General Motors Corporation, successfully synthesized the first formulations of chlorofluorocarbon (CFC)-based refrigerants, commonly known as "Freon." These chemicals were safer and less combustible than their predecessors, and soon dominated the marketplace.[1]

With this rapid innovation came calls for increased national and international oversight. In 1974, F. Sherwood Rowland and Mario Molina at the University of California, Irvine proved that the emission of CFCs depleted the Earth's ozone layer, exposing the

---

[1] *See generally* Paul Lester, U.S. Dep't of Energy, *History of Air Conditioning* (July 20, 2015), https://www.energy.gov/articles/history-air-conditioning; James W. Elkins, Nat'l Oceanic & Atmospheric Admin., *Chlorofluorocarbons (CFCs)*, https://gml.noaa.gov/hats/publictn/elkins/cfcs.html (last visited Mar. 29, 2023).

Earth's surface to harmful UV radiation. So in 1987, the United States, together with the international community, signed the Montreal Protocol, which mandated the gradual phaseout of CFCs. As CFCs were phased out, a new class of chemicals called hydrofluorocarbons (HFCs) took their place. HFCs, unlike CFCs, do not contribute significantly to ozone layer depletion, making them a suitable substitute under the Montreal Protocol. But, while the substitution of HFCs protects the ozone layer, it greatly contributes to the risks of climate change as HFCs are a potent greenhouse gas. So just as they had decades prior for CFCs, the United States and the international community began considering a phaseout of HFCs as well. In 2016, they agreed to the Kigali Amendment to the Montreal Protocol which requires states parties to the Protocol to phasedown HFC usage over the next thirty years.[2]

While the Kigali Amendment was under consideration, the United States Congress took steps in 2020 to address domestic HFC usage by passing the American Innovation and Manufacturing Act (AIM Act), 42 U.S.C. § 7675. The AIM Act directs the EPA to phase down the consumption and production of HFCs in the United States over the next fifteen years until 2036. In 2036, the Act requires that HFC usage in the United States be capped at 15% of

---

[2] U.S. Env't Prot. Agency, *Recent International Developments under the Montreal Protocol* (last updated Sept. 16, 2022), https://www.epa.gov/ozone-layer-protection/recent-international-developments-under-montreal-protocol.

baseline levels.  *See* 42 U.S.C. § 7675(e)(2)(C).  To implement the phasedown, Congress provided that certain consumption and production activities would require "allowances"—essentially, usage permits—and placed a cap on the number of permits available each year.  *See id.* §§ 7675(e)(2)(A), (e)(2)(D); *see also id.* § 7675(b)(2), (3), (7) (defining "allowance," "consumption," and "produce," respectively).  Over time the cap diminishes by a fixed percentage provided in the Act each year.  *Id.* § 7675(e)(2)(B).  The Act also allows the firms that receive permits to transfer their permits between one another pursuant to regulations promulgated by the EPA.  *Id.* § 7675(g).  The Act directs the EPA to conduct appropriate rulemakings to establish "an allowance allocation and trading program" consistent with these requirements.  *Id.* § 7675(e)(3).

This petition concerns the permit allocations made for calendar year 2022, which were issued in October 2021.  There are two Federal Register notices relevant to this petition.  The first was a notice of final rulemaking for what is called the "*Framework Rule*," which sets forth the EPA's methodology for collecting data on historical HFC usage and a formula for calculating the allocation of permits.  *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116 (Oct. 5, 2021) (codified at 40 C.F.R. § 84.1–84.35) [hereinafter *Framework Rule*].  The second was an "*Allocation Notice*," which set forth the annual allocations in a series of tables line-by-line, firm-by-firm.  *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance*

*Allocations for Production and Consumption of Regulated Substances under the American Innovation and Manufacturing Act of 2020*, 86 Fed. Reg. 55,841 (Oct. 7, 2021) [hereinafter *Allocation Notice*].

At a high level, the *Framework Rule*'s methodology worked like this:  First, the EPA collected HFC-usage data for the companies involved in the domestic HFC industry.  Second, the EPA used this industry-wide data to calculate the baseline levels of domestic HFC-usage.  Third, the agency calculated the annual nationwide allowance cap by multiplying the baseline level by a target percentage specified by statute.  *See* 42 U.S.C. § 7675(e)(1)(A)–(C), (e)(2)(B).  At this step, some allowances are removed from the pool and set aside for application-specific allowances and for allocation later in the year.  40 C.F.R. § 84.11(a)(3).  Fourth, the EPA identified each industry participant's three highest years of usage for the period 2011–2019 and found the average of these numbers.  *Id.* § 84.11(a)(1).  Fifth, the EPA determined each firm's percentage share of the industry by taking that firm's individual three-year average (step 4) and dividing it by the sum of all firms' three-year average numbers.  *Id.* § 84.11(a)(2).[3]  Sixth, the EPA multiplied each participant's percentage by the annual allowance cap (step 3) to determine each firm's allocation of yearly allowances.  *Id.* § 84.11(a)(4).

---

[3] Forty firms received consumption allowances in 2022.

In this case, Petitioner-RMS, a Georgia-based manufacturer of an HFC blend called R-421A, or "Choice," challenges its allocation of HFC consumption allowances for calendar year 2022.[4]  On the merits, RMS brings an arbitrary and capricious challenge alleging that two other entities—here, named Companies A and B—received credit for historical usage that should have been credited to RMS.  Specifically, RMS alleges that Company A was merely its shipping agent for certain HFCs, and that RMS should qualify as the "importer" entitled to credit for this historical usage under the regulations.  *See* 40 C.F.R. § 84.3.  As to Company B, RMS alleges that Company B infringed its patent on R-421A, and thus RMS should receive credit for the usage attributable to that infringement.  While the merits of these arguments turn on different legal principles, they have the same practical effect for RMS:  Because the EPA allegedly short-changed RMS in these instances, RMS's three-year average (step 4) was lower than it should have been.

★      ★      ★

To aid our discussion, we provide a visual representation of this critical step in the EPA's methodology:

### Figure 1

$$\frac{RMS_{\text{Three-Year Avg.}}}{RMS_{\text{Three-Year Avg.}} + Firm\ 2_{\text{Three-Year Avg.}} + \ldots + Firm\ 40_{\text{Three-Year Avg.}}}$$

---

[4] RMS does not challenge the *Framework Rule* itself in this petition.

In essence, RMS argues that the "RMS $_{\text{Three-Year Avg.}}$" term was too small due to the EPA's arbitrary and capricious actions with respect to Companies A and B, and therefore, the output of this formula was smaller than it should have been.  Because the output of this formula represents RMS's percentage share of the total permit allocation if this number was too small, then it also means RMS received fewer allowances than it should have in step 6.

## II.

The AIM Act adopts the judicial review provision of the Clean Air Act, 42 U.S.C. § 7607, and makes it applicable "as though [the AIM Act] were expressly included in title VI of [the Clean Air] Act."  42 U.S.C. § 7675(k)(1)(C).  Section 7607(b)(1) provides that challenges to "nationally applicable" actions "may be filed only in" the D.C. Circuit, while challenges to "locally or regionally applicable" actions "may be filed only" in the regional Courts of Appeals.[5]  A petition for review of a locally or regionally applicable action may be heard only in the D.C. Circuit if the EPA Administrator first makes and publishes a finding that the action has a "nationwide scope or effect."  *Id.*  Because the EPA made no such finding, our

---

[5] We do not consider today whether § 7607 is a jurisdictional or venue provision.  By its text, the "may be filed only" phrasing makes this forum provision mandatory, leaving us no discretion.  The EPA asks that we enforce the provision, and that is enough for our purposes today.  The nuances of the distinction between jurisdictional and venue provisions are not relevant to the disposition of this petition, and so we reserve that question for a later day.

decision today turns entirely on whether the EPA's action is "nationally" or "locally or regionally" applicable.

Whether a petition under the Clean Air Act is "nationally applicable" is an issue of first impression for this court. That said, we do not write on an entirely blank slate—our sister circuits have established a consensus that we should begin our analysis by analyzing the nature of the EPA's action, not the specifics of the petitioner's grievance. *See, e.g.*, *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) ("The nature of the regulation, not the challenge, controls."); *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013) ("[I]n determining that [an action] is a 'locally or regionally applicable' action, this Court need look only to the face of the rulemaking, rather than to its practical effects."); *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670 (7th Cir. 2017) ("Under the straightforward (if wordy) statutory text, venue depends entirely on—and is fixed by—the nature of the agency's action . . . .").

Our own review of § 7607(b)(1)'s text leads us to the same conclusion. The text makes no reference to the nature of the petition. Instead, it reads, "[a] petition for review of action of the Administrator [under specified sections], or any other nationally applicable regulations promulgated, or final action taken . . . may be filed only in the [D.C. Circuit]." 42 U.S.C § 7607(b)(1). As the Seventh Circuit put it, the text is "wordy," but clear. *S. Ill. Power Coop.*, 863 F.3d at 670. The phrase "nationally applicable"

describes the "regulations promulgated, or final action taken," not the nature of the "petition for review."

With this in mind, we look to the face of the challenged EPA action, and RMS designated the *Allocation Notice* in its petition as the challenged action. The *Allocation Notice* is three pages long and, except for a brief introduction, consists entirely of three tables listing each firm's permit allocation for calendar year 2022. *Allocation Notice*, 86 Fed. Reg. at 55,841–43. Table 1 addresses allocations set aside for specific uses required by 42 U.S.C. § 7675(e)(4)(B)(iv). 86 Fed. Reg. at 55,842 tbl.1. Table 2 addresses the allocation of production allowances. *Id.* at tbl.2. Finally, and relevant here, table 3 addresses consumption allowances. *Id.* at 55,843 tbl.3. Table 3 has forty-two line-item entries; forty of these are company names followed by their calculated consumption allocation for the year. *Id.*[6] RMS appears on the list under the entry for "RMS of Georgia," and it received 1,615,592.9 allowances for 2022.

We conclude that the *Allocation* Notice was nationally applicable. First, as a textual matter, nothing in it limits the scope of the EPA's action based on geography. Indeed, the *Allocation Notice* assigns allowances to firms nationwide. Second, the

---

[6] The two other entries account for the application-specific allocations referred to in table 1 and permits set-aside for allocation later in the year. *See Framework Rule*, 86 Fed. Reg. at 55,155 (describing the purpose of set-aside permits).

allowances themselves are not geographically restricted. *See* 42 U.S.C. § 7675(e)(2)(D)(ii) (describing the "[n]ature of allowances"). If RMS decided to do so, it could relocate its facilities anywhere else in the country and utilize its permits elsewhere. The permits were allocated on a firm-specific basis, not a site-specific basis.

RMS advances two theories for why the *Allocation Notice* is locally applicable, but neither is persuasive. First, RMS argues that the EPA's allocation of permits to it is based on local factors relevant only to its facility in Alpharetta, Georgia. RMS relies on the Seventh Circuit's decision in *Madison Gas & Electric Co. v. EPA*, which addressed a similar allowance trading regime under the EPA's acid rain program. *See* 4 F.3d 529, 530 (7th Cir. 1993), *overruled by S. Ill. Power Coop.*, 863 F.3d at 668 & n.1. There, the Seventh Circuit concluded that it was the proper forum—despite permits being allocated to firms nationwide, in a single table and in a single notice—because "*the challenge* is based upon an entirely local factor . . . ." *Id.* at 531 (emphasis added). First, *Madison Gas* is of dubious persuasiveness because it has been overruled in its own circuit. Second, as explained above, we have rejected for ourselves the petition centric approach it advocates. Third, the argument fails on its own terms as RMS's allocation of permits is not "based upon an entirely local factor." The *Allocation Notice*, by its terms, is an implementation of the EPA's separately promulgated *Framework Rule*, and allowances are made consistent with it. *Allocation Notice*, 86 Fed. Reg. at 55,841. The formula described in the *Framework Rule* does not base each firm's allowance on

entirely firm-specific factors. Recall our representation of the calculation of RMS's share of the allowance pool:

**Figure 1**

$$\frac{\text{RMS}_{\text{Three-Year Avg.}}}{\text{RMS}_{\text{Three-Year Avg.}} + \text{Firm 2}_{\text{Three-Year Avg.}} + \ldots + \text{Firm 40}_{\text{Three-Year Avg.}}}$$

As part of its methodology, the EPA identified RMS's three highest years of HFC usage between 2011 and 2019 and averaged them together; this is the "RMS $_{\text{Three-Year Avg.}}$" term. The local factors RMS identifies are essentially its disputes with Companies A and B, and RMS's own historic usage of HFCs. The EPA's resolution of these factual disputes, RMS argues, resulted in its three-year average, represented as "RMS $_{\text{Three-Year Avg.}}$," being improperly low and thus its share of the allowance pool being improperly low as well. But while the "RMS $_{\text{Three-Year Avg.}}$" term appears by itself in the numerator of this formula, it is combined with the thirty-nine other HFC industry firms in the denominator. Thus, RMS's allocation is not based on its own "entirely local" historical HFC usage but is instead relative to and based on every single other firm's historical usage.

RMS's second argument has a similar theme. It argues that the *Allocation Notice* is not one big action but instead a document detailing many smaller individual actions. Viewed this way, RMS argues that it is challenging only its line-item in table 3, not table 3 as a whole or the other firm's allocations. But this argument presents too narrow a view of the EPA's final action. Rather, the

*Allocation Notice* is better understood as one EPA action, and RMS's allocation an inseparable component of it. By placing a cap on allowances, Congress created a kind of "zero-sum" game for the HFC industry. Any gain in permits that one firm gets must be off-set by a loss to another firm and vice versa. The *Framework Rule*'s methodology bears this out. Recall again the formula in figure 1. While our version features RMS, each firm in table 3 is also subject to the same formula—just with its own three-year average in the numerator in place of RMS's. Of course, any shift in one firm's three-year average will change the output of that firm's formula. But it will also change every other firm's formula as well. This is because each firm's three-year average term appears not just in the numerator, but in the denominator as well and the denominator is shared across firms nationwide. Any shift in any single firm's three-year average demands a recalculation of the shared denominator and thus the formulas for every single firm listed in table 3. The EPA's *Allocation Notice* in table 3 is thus the result of a singular EPA action allocating HFC allowances nationwide, and RMS cannot isolate its individual component of it.

We conclude that because the *Allocation Notice* allocated permits nationwide and was not restricted in geographic scope it was nationally applicable. Accordingly, RMS's challenge to its

allocation, as an inseparable component of that action, must be heard in the D.C. Circuit.  *See* 42 U.S.C. § 7607(b)(1).[7]

## III.

All that is left for us to do is to transfer this case to the D.C. Circuit.  Because Congress vested that court, and not this court, with the authority to hear this petition we think the D.C. Circuit is better suited to rule on the pending motion to intervene made by FluoroFusion, Inc, and so, we leave that motion pending and transfer it as well.

Accordingly, the Clerk is directed to **TRANSFER** this petition, with the pending motion to intervene, to the United States Court of Appeals for the District of Columbia Circuit.

**PETITION TRANSFERRED.**

---

[7] By utilizing the Clean Air Act's judicial review provision for the AIM Act, it is reasonable to assume Congress would not have intended every challenge to AIM Act agency actions be heard in the D.C. Circuit and our decision is not in conflict with this principle.  The EPA's regulations authorize it to take firm specific actions to "retire, revoke, or withhold the allocation of allowances" to firms that violate the EPA's regulations.  *See* 40 C.F.R. § 84.35(a); *see also Framework Rule*, 86 Fed. Reg. at 55,168–72 (discussing EPA's enforcement authority).  At oral argument, EPA's counsel suggested that it could "retire, revoke, or withhold" allowances to a firm that failed to maintain "documentation of . . . final payment of the antidumping" duties on HFC imports, as required by 40 C.F.R. § 84.31(c)(2)(xix), and such an action might be considered "locally" applicable as it modifies only one firm's allocations.  As we have discussed though, the EPA's action here did not act on the individual firm level and instead distributed permits to multiple firms, nationwide.