**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1418

STATE OF WEST VIRGINIA,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,

Respondents.

-------------------------------------------------------------

APPALACHAIN MOUNTAIN CLUB; SIERRA CLUB,

Amici Supporting Respondents.

On Petition for Review of an Order of the Environmental Protection Agency.  (EPA-R03-OAR-2021-0873)

Argued:  October 27, 2023                              Decided:  January 10, 2024

Before NIEMEYER, THACKER, and QUATTLEBAUM, Circuit Judges.

Respondents' Motion to Transfer denied and Petitioner's Motion for Stay granted by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Quattlebaum joined.  Judge Thacker wrote a dissenting opinion.

**ARGUED:** Michael Ray Williams, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Petitioner. Alex Jacob Hardee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Zachary M. Fabish, Washington, D.C., Joshua D. Smith, SIERRA CLUB, Oakland, California; Seth L. Johnson, Kathleen L. Riley, Neil Gormley, EARTHJUSTICE, Washington, D.C., for Amici Curiae.

NIEMEYER, Circuit Judge:

On October 1, 2015, the Environmental Protection Agency ("EPA") exercised its authority under the Clean Air Act to revise the National Ambient Air Quality Standards for ozone, requiring each State to submit to the EPA a "State Implementation Plan" or "SIP" to implement the more stringent requirements. On February 4, 2019, West Virginia submitted its SIP, but the EPA, by a final action dated February 13, 2023, disapproved it, finding that the State's plan did not meet the substantive requirements of the Clean Air Act. The EPA ruled that West Virginia's SIP "fail[ed] to contain the necessary provisions to eliminate emissions that would contribute significantly to nonattainment or interfere with maintenance of the [air quality standards] in [downwind States]," namely in two States east of West Virginia. Challenging the lawfulness of the EPA's disapproval, West Virginia filed this petition for review.

The EPA has filed a preliminary motion to transfer West Virginia's petition for review to the Court of Appeals for the District of Columbia, pursuant to the Clean Air Act's venue provision, 42 U.S.C. § 7607(b)(1), or, in the alternative, to dismiss it for lack of venue. And West Virginia has filed a preliminary motion to stay the EPA's final action pending the outcome of its petition for review.

For the reasons given herein, we deny the EPA's motion to transfer or to dismiss, and we grant West Virginia's motion for a stay.

3

I

In furtherance of its responsibilities under the Clean Air Act "to protect and enhance the quality of the Nation's air resources," 42 U.S.C. § 7401(b)(1), the EPA established air quality standards for the emission of gases that contribute to the formation of ground-level ozone. In 2015, it revised the standards, thereby requiring each State to issue and transmit to the EPA a State Implementation Plan or SIP to comply with the revised standards. West Virginia transmitted its SIP to the EPA in February 2019, which, as relevant here, addressed the "good neighbor" provision of the Clean Air Act. That provision requires SIPs to contain adequate provisions to prohibit in-state emissions of ozone-forming gases from having specified adverse air quality effects on downwind States. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I).

Ozone, a molecule of three oxygen atoms (chemically, $O_3$), is a very unstable gas that has both beneficial and harmful effects on human health. Ozone in the stratosphere is formed from $O_2$ in the presence of ultraviolet light from the sun, and it protects the earth from harmful ultraviolet rays. On the other hand, ground-level ozone — formed from the oxides of nitrogen ($NO_x$) and volatile organic compounds (VOCs) such as hydrocarbons from fuel combustion in the presence of sunlight — is a pollutant that often manifests as smog and is harmful to human health. Thus, to reduce ground-level ozone, emissions of $NO_x$ and VOCs from power plants, other industrial facilities, and off-road engines, as examples, would need to be reduced.

The EPA's efforts to reduce ground-level ozone are thus focused on the emissions of $NO_x$ and VOCs. And in regulating those gases, the EPA faces the problem that gases

4

emitted in one State often move downwind to other States, forming ozone during their exposure to sunlight. For example, as relevant in this case, ozone measured in Pennsylvania, New Jersey, and Maryland might be the product of $NO_x$ and VOC emissions in West Virginia or Ohio. Thus, to enforce its national air quality standards, the EPA collects data at numerous monitoring points and uses those data to analyze where harmful emissions are produced and where they contribute to the formation of ground-level ozone. Federal regulations of ozone require each State to develop a SIP to demonstrate how the State will reduce gases that produce ozone.

After the EPA issued its revised 2015 air quality standards for ozone, West Virginia submitted a SIP, addressing how it planned to comply with its "good neighbor" obligations under the revised standards. The EPA, however, issued an initial proposal to reject West Virginia's SIP on February 22, 2022, offering a detailed explanation for its disapproval. And a year later, the EPA adopted its proposed reasons for rejection in a final agency action on February 13, 2023, finding West Virginia's SIP inadequate.

In its 2022 proposed rejection of West Virginia's SIP, the EPA conducted its analysis under an informal "4-step interstate transport framework," which it used to evaluate all States' SIPs. Under the *first* step of that framework, the EPA identifies monitoring sites having "problems attaining and/or maintaining" the established air quality standards. Under the *second* step, it identifies States "that impact those air quality problems in other (*i.e.*, downwind) [S]tates," thus "link[ing]" those States with the downwind States. Under the *third* step, it considers "the emissions reductions necessary . . . to eliminate each linked upwind [S]tate's significant contribution to nonattainment" of

5

the standard. And under the *fourth*, it considers that State's proposed enforcement measures.

Applying the 4-step framework, the EPA found, as particularized to West Virginia, that 10 monitoring sites in 5 States downwind from West Virginia reported problems of attainment, and 4 of those sites in 2 States were "linked" to West Virginia's emissions. The EPA concluded:

> These data were examined to determine if West Virginia contributes at or above the threshold of 1 percent of the 2015 8-hour ozone [air quality standard] (*i.e.*, 0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 1 of this document, the data indicate that in 2023, emissions from West Virginia contribute greater than 1 percent of the [air quality standard] to nonattainment or maintenance-only receptors in Fairfield County-Westport, Fairfield County-Stratford, and New Haven County in Connecticut, as well as Bucks County, Pennsylvania.

Proposed Disapproval of West Virginia's Interstate Transport of Air Pollution Plan for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9516, 9525 (proposed Feb. 22, 2022) (to be codified at 40 C.F.R. pt. 52) (footnote omitted) (the "Proposed Rule"). The EPA then assessed whether West Virginia's SIP demonstrated that it would reduce the observed emissions and concluded that the SIP did not provide an adequate response. Addressing by category the source sites of West Virginia's emissions, it found:

> Based on the EPA's evaluation of West Virginia's SIP submission, the EPA is proposing to find that West Virginia's February 4, 2019 SIP submission . . . does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone [air quality standard] in any other [S]tate.

*Id*. at 9532.

6

In 2023, the EPA summarized its 2022 proposed findings in its final agency action, adopting them to conclude that West Virginia's SIP was inadequate. The EPA included its rejection of West Virginia's SIP as part of a consolidated rule rejecting the SIPs of 20 other States. *See* Disapprovals of Interstate Transport of Air Pollution Plans for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336, 9337–38 (Feb. 13, 2023) (to be codified at 40 C.F.R. pt. 52) (the "Final Rule"). Although calling its Final Rule a consolidated action, the EPA nonetheless reviewed each State's SIP, one by one, applying its 4-step interstate transport framework to each State's circumstances. It concluded, for the reasons applicable to the given State, that its SIP was insufficient. With respect to West Virginia in particular, it found that the State would still contribute significantly to nonattainment in, or interference with maintenance of the 2015 air quality standards for ozone in Connecticut and Pennsylvania, in violation of its good neighbor obligations. The agency accordingly disapproved West Virginia's SIP. *See id.* at 9360.

From the EPA's final action, West Virginia filed this petition for review.

Before briefing the merits, the EPA filed a motion to transfer West Virginia's petition to the Court of Appeals for the District of Columbia or to dismiss it based on improper venue. While the EPA recognized that the Clean Air Act fixes venue in any relevant court of appeals if its action is "locally or regionally applicable," it argued that the proper venue here is the D.C. Circuit because its action is a consolidated, "nationally applicable . . . action" or, in the alternative, that it issued a regionally applicable action "based on a determination of nationwide scope or effect." *See* 42 U.S.C. § 7607(b)(1).

7

Also before briefing, West Virginia filed a motion to stay the EPA's final action pending the outcome of our review of its petition, claiming that it would be irreparably harmed if it had to proceed now with what it claims to be an unlawful final action and that the EPA would not be harmed by such a stay.

Each party opposed the other's motion, and we conducted oral arguments on both motions.

## II

We address first the EPA's motion to transfer or dismiss.

Fixing the venue for review of the EPA's actions, the Clean Air Act provides:

> A petition for review of . . . any . . . *nationally applicable* regulations promulgated, or final action taken, by the [EPA] under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the [EPA's] action in approving or promulgating any implementation plan . . . or any other final action of the [EPA] under this chapter . . . which is *locally or regionally applicable* may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on *a determination of nationwide scope or effect* and if in taking such action the [EPA] finds and publishes that such action is based on such a determination.

42 U.S.C. § 7607(b)(1) (emphasis added). Thus, if the final action is *nationally applicable*, venue is proper in the D.C. Circuit. If the final action is *locally or regionally applicable*, venue is generally proper in the appropriate court of appeals. But if a locally or regionally applicable action is based on a *determination of nationwide scope or effect*, venue is appropriate only in the D.C. Circuit. To determine venue, therefore, we focus on the

8

*geographical reach* of the EPA's action, both with regard to its applicability and with regard to the scope and effect of the EPA's determination. To determine whether it is national in scope or effect, the statute requires us to look only to the EPA's determination, assessing the circumstances it addressed and the conclusions it reached. This does not mean, however, that the venue issue turns on whether a national rule or standard was applied to make the determination. Were that the appropriate consideration, there could be no local or regional action because every EPA action applies national standards — statutes, regulations, and nationally applicable practices. Rather, Congress made clear that our focus must be on the *geographical reach* of the agency's final action and the determination on which it is based — not the standard that the agency applied.

Thus, to determine if an agency action is based on a determination of nationwide scope or effect, we examine the geographical aspects of the factual and analytical circumstances of the agency's determination. An action is local or regional if it assesses and analyzes local or regional circumstances that are distinct from the circumstances in other localities or regions and it rules on those circumstances. A determination would be national in scope and effect if it addressed and analyzed circumstances common to all regions in the Nation.

Turning first to the factual circumstances addressed by the EPA's action rejecting West Virginia's SIP, it is clear that the EPA focused on factual data localized to West Virginia and two downwind States "linked" to West Virginia. It accepted West Virginia's submission that 10 monitoring sites in 5 downwind States had problems attaining and/or maintaining established air quality standards. It also accepted the conclusion that 4 of those

9

downwind sites in Connecticut and Pennsylvania were "linked" to West Virginia such that the data indicated that West Virginia contributed to their problems in attaining or maintaining established air quality standards. But the EPA rejected West Virginia's suggestion that its downwind contributions would be sufficiently reduced by the closure of six power plants in the State. Likewise, it rejected West Virginia's response to emissions from "other sources in West Virginia" and discussion of international sources. In short, the circumstances addressed by the EPA were those particular and unique to West Virginia.

The EPA also rejected West Virginia's analysis of those factual circumstances. In its final action, the EPA explained that West Virginia was "linked" to downwind receptors, meaning that the State was contributing more than the allowable amount of ozone to two downwind States. It further explained that, due to "technical and legal flaws" in parts of West Virginia's analysis, West Virginia's rationales of why its downwind contributions were not significant were inadequate. Final Rule, 88 Fed. Reg. at 9360. The EPA then concluded that "the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion." *Id.* These discussions all focused on the data particular to West Virginia and the analyses that West Virginia conducted with respect to those state-specific data.

In short, the EPA's final action at issue here was not nationally applicable, but instead locally or regionally applicable. And its action disapproving West Virginia's SIP was based entirely on West Virginia's particular circumstances and its analysis of those circumstances. Its action, therefore, was not based on a determination of nationwide scope or effect.

10

Nonetheless, the EPA argues that its final action was nationally applicable or was based on a determination of nationwide scope or effect because its Final Rule disapproved of West Virginia's SIP together with 20 other SIP submissions. It notes that it fashioned its several disapprovals as a consolidated, "single agency action." And taking its publication as a whole, the EPA argues that its action is nationally applicable because "the Final Rule applies a uniform and nationally consistent approach to plans submitted by [S]tates across the country, disapproving SIPs from 21 [S]tates throughout eight of the ten EPA Regions and ten federal judicial circuits." Addressing West Virginia's arguments generally, the EPA insists that "[i]t makes no difference that West Virginia purports to challenge the effects of the Final Rule only as applied to West Virginia's SIP" because "the question here is whether the action itself is nationally applicable, not whether the nature and scope of the arguments raised or relief sought by a petitioner are nationally applicable." It points to the fact that it relied on "a common core of national policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S." and applied "the same, nationally consistent 4-step interstate transport framework for assessing obligations for the 2015 ozone [air quality standards] that it has applied in other nationally applicable rulemakings." (Quoting Final Rule, 88 Fed. Reg. at 9380). Thus, it concludes that it applied national standards and a "common core" of policy judgments in rejecting West Virginia's SIP and therefore its action was either "nationally applicable" or at least "based on a determination of nationwide scope or effect."

There are, however, two glaring problems with the EPA's argument. *First*, it argues that because its February 13, 2023 final action "applie[d] a uniform and nationally

11

consistent approach to [the State SIPs]" that it disapproved, its disapprovals were "nationally applicable." But this argument applies a flawed interpretation of the venue requirement. While national standards — imposed by the statute, regulations, and practices — were indeed applied to reject West Virginia's SIP, the venue provision of the Clean Air Act does not focus on whether national standards were applied. Rather it defines venue first in terms of whether the final action is nationally applicable, as opposed to locally or regionally applicable, and then in terms of whether the "action is based on a determination of nationwide scope or effect." 42 U.S.C. § 7607(b)(1). Thus, here, venue turns on the EPA's reasons for determining that West Virginia's SIP was insufficient. As we noted above, if application of a national standard to disapprove a plan were the controlling factor, there never could be a local or regional action as recognized by the Clean Air Act because every action of the EPA purportedly applies a national standard created by the national statute and its national regulations. It is not the nature of the applied standard that controls; it is the geographical reach of the action and the determination on which it is based that does.

*Second*, the EPA argues that because it disapproved of the SIPs of 21 States in a consolidated, single agency action, its determination that the West Virginia SIP was inadequate somehow became national in scope or effect. This, however, throws a blanket labeled "national" over 21 individual decisions rejecting 21 separate States' SIPs in an effort to convert each unique state decision into a national one. Of course, if the reason for rejecting all state SIPs was based on circumstances *common to all States*, the EPA's argument would make sense. But that is not what the EPA actually did. It assessed the

12

local and regional circumstances of each of the 21 States and *based on those circumstances*, it rejected each SIP, giving a unique mixture of reasons for each rejection, even though some of the individual reasons overlapped. This individualized process was consistent with the requirements of the Clean Air Act itself and the rights given to each State to challenge the EPA's assessment of its SIP. The Clean Air Act instructs that "[e]ach State" shall submit a SIP implementing the air quality standards. *See* 42 U.S.C. § 7410(a)(1). And following each State's submission, the EPA approves or disapproves of each State's "plan" — using the word "plan" in the singular to indicate that the agency acts on *each plan*. *See id*. § 7410(k)(1)–(3). Thus, the relevant agency action for our review here is the EPA's disapproval of West Virginia's SIP. And the fact that the EPA consolidated its disapprovals in a single final rule does not, by that fact alone, make its 21 separate decisions included within its final rule either a single nationally applicable action or one based on a determination of nationwide scope or effect.

The EPA nonetheless presses its argument by citing *West Virginia Chamber of Commerce v. Browner*, an unpublished opinion in which we transferred a petition to review a "SIP Call" to the D.C. Circuit. No. 98-1013, 1998 WL 827315 (4th Cir. Dec. 1, 1998) (per curiam). A "SIP Call," however, is materially different in kind from an action disapproving of a State's SIP. A SIP Call is "an EPA rule calling for revision to any SIP not meeting a newly-established standard." *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011). In *Browner*, the SIP Call directed 22 States and the District of Columbia to revise their ozone SIPs based on the implementation of new, state-specific $NO_x$ budgets. 1998 WL 827315, at *3–4. Even though we recognized that the SIP Call

13

fell "somewhere in between" a clearly nationally applicable action and a clearly locally or regionally applicable action, we nonetheless concluded that the SIP Call was nationally applicable because of "the nationwide scope and interdependent nature of the problem, the large number of states, spanning most of the country, being regulated, the common core of knowledge and analysis involved in formulating the rule, and the common legal interpretation advanced of" the relevant Clean Air Act provisions. *Id.* at *6–7.

We believe that *Browner* provides the EPA with little support because the SIP Call there is distinguishable from the Final Rule here in at least one significant way — the *Browner* SIP Call was preceded by a single proposed rule covering all affected States, whereas the Final Rule here was preceded by several proposed rules individually tailored to each affected State's SIP. *See Browner*, 1998 WL 827315, at *3. In fact, the Final Rule here directed the affected States to consult these individual proposed rules for the "full basis" for each SIP disapproval. *See* Final Rule, 88 Fed. Reg. at 9354. And the subject of our review is the disapproval of West Virginia's SIP.

At bottom, despite the national standards applied by the EPA in rejecting West Virginia's SIP, its determination was nonetheless particular to West Virginia's circumstances — *i.e.*, based on West Virginia's data, analysis, and conclusions — and it was applicable *only to West Virginia*. Indeed, the EPA conceded in its Final Rule that it assessed each SIP "in light of the facts and circumstances of *each particular [S]tate's* submission." Final Rule, 88 Fed. Reg. at 9340 (emphasis added); *see also id*. at 9354 ("[T]he contents of each individual [S]tate's submission were evaluated on their own merits"). Indeed, the EPA repeatedly recognized that it undertook an "extensive evaluation

14

of the merits of each [State's] SIP submissions." *Id.* at 9370; *see also id*. at 9338, 9354, 9363, 9364, 9366, 9369 (acknowledging that each SIP submission was reviewed on its "merits").

We readily conclude that the proper venue for reviewing West Virginia's petition is in this court, the Fourth Circuit. In reaching this conclusion, we join several other circuits that have reached the same conclusion on the EPA's motions to transfer petitions to the D.C. Circuit for review of the same EPA Final Rule dated February 13, 2023. *See Texas v. EPA*, No. 23-60069, 2023 WL 7204840 (5th Cir. May 1, 2023); *Arkansas v. EPA*, No. 23-1320 (8th Cir. Apr. 25, 2023); *Missouri v. EPA*, 23-1719 (8th Cir. May 26, 2023); *Allete, Inc. v. EPA*, No. 23-1776 (8th Cir. May 26, 2023) (Minnesota); *Kentucky v. EPA*, No. 23-3216 (6th Cir. July 25, 2023).

III

Addressing West Virginia's motion for a stay of the EPA's final action pending review of the State's petition, we apply the standard set forth in *Nken v. Holder*, 556 U.S. 418 (2009), to inform our discretion. Thus, when deciding whether to stay an agency action, we consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Sierra Club v. U.S. Army Corp of Eng'rs*, 981 F.3d 251, 256 (4th Cir. 2020) (per curiam) (cleaned up); *see also Nken*, 556 U.S. at 426.

15

Applying the first factor — whether West Virginia is likely to succeed on the merits — we conclude that it is neutral. West Virginia has set forth plausible grounds in support of its petition, but so also has the EPA in support of its position.

As to the second factor, however, we conclude that it weighs clearly in favor of West Virginia. The State submitted affidavits asserting that West Virginia's agency staffing is strained in capacity and that it would be burdensome to begin processing permit applications for dozens of facilities within the State, as would be required as a consequence of the EPA's final action. The State notes that if the EPA's disapproval is unlawful, the State's expenditures of its valuable resources will be irrevocably lost. The State also asserts that, absent a stay, providers of electricity in West Virginia will pass off compliance expenses to West Virginians through rate hikes. While the EPA argues that the State's claim of lost resources is too speculative, we reject the argument. Clearly, the agency's action will require a response that, in several respects, will consume state labor and resources. Such a response simply cannot be made without cost and burden to the State.

As to the third factor, West Virginia contends that a stay will not substantially burden the EPA or the public. It argues that the stay would be only temporary to maintain the status quo pending review. Moreover, it notes that three years passed between when the EPA received West Virginia's SIP and when it proposed its disapproval of it. In light of the EPA's own delay in responding to West Virginia's submission, we agree with West Virginia that "a few more months of previously EPA-approved practices would have a relatively minor effect on air quality" in the two downwind States found affected.

16

Finally, the public interest surely lies in favor of reducing ozone, a gas harmful to human health, and the EPA's action is aimed at doing so.  But the public also has an interest in the efficient production of electricity and other industrial activity in the State, even as such production is balanced with environmental needs.  Because the issue here is essentially one of a short-term stay, we cannot find that the public interest precludes our granting one in light of other relevant circumstances.

Exercising our discretion, we thus conclude that West Virginia has demonstrated that we should issue a stay pending our review of its petition.  And we add that a number of other courts addressing stays with respect to the same EPA Final Rule have likewise granted them.  *See, e.g.*, *Texas*, 2023 WL 7204840 (Texas and Louisiana); *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); *Missouri v. EPA*, 23-1719 (8th Cir. May 26, 2023); *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023) (Mississippi); *Nevada Cement Co. v. EPA*, No. 23-682 (9th Cir. July 3, 2023); *Allete, Inc. v. EPA*, No. 23-1776 (8th Cir. July 5, 2023) (Minnesota); *Kentucky v. EPA*, No. 23-3216 (6th Cir. July 25, 2023); *Utah v. EPA*, 23-9509 (10th Cir. July 27, 2023); *Oklahoma v. EPA*, 23-9514 (10th Cir. July 27, 2023).

\*    \*    \*

For the reasons given, we deny the EPA's motion to transfer this petition for review to the D.C. Circuit or to dismiss, and we grant West Virginia's motion for a stay.

IT IS SO ORDERED.

17

THACKER, Circuit Judge, dissenting:

In my view, the Final Rule is clearly nationally applicable. Therefore, I dissent.

The majority conflates a "nationally applicable" final action with one that is "locally or regionally applicable" but "based on a determination of nationwide scope or effect." In other words, the majority believes that a final action is only nationally applicable if it is based on a determination of nationwide scope or effect. But that cannot be the case. Congress specifically set out three district venue provisions. If a nationally applicable action was only one that was based on a determination of nationwide scope or effect, then there would need only be two venue provisions. But Congress made clear that there are three. The majority ignores the primary distinction between nationally applicable and locally applicable final actions in favor of an illogical analysis that, until last year, no court had adopted.

As the majority explains, the Clean Air Act "establishes a rather complicated system of judicial review," offering three venue provisions for a challenge to a Clean Air Act final action. *1000 Friends of Md. v. Browner*, 265 F.3d 216, 223 (4th Cir. 2001); *see* 42 U.S.C. § 7607(b)(1). First, a petition challenging a "nationally applicable regulation[] promulgated, or final action taken" pursuant to the Clean Air Act "may be filed only in the United States Court of Appeals for the District of Columbia ("D.C. Circuit")." 42 U.S.C. § 7607(b)(1). Second, a petition challenging an EPA "final action . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." *Id.* Third, "[n]otwithstanding" the second venue provision, a petition challenging an EPA final action that is locally or regionally applicable "may be filed only

18

in the [D.C. Circuit] if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." *Id.*

Thus, as the majority correctly recognizes, the Clean Air Act "defines venue *first* in terms of whether the final action is nationally applicable, as opposed to locally or regionally applicable, and *then* in terms of whether the 'action is based on a determination of nationwide scope or effect.'" *Ante* at 12 (emphasis supplied) (quoting 42 U.S.C. § 7607(b)(1)). But then the majority takes a wrong turn. Rather than considering *first* whether the final action is nationally applicable -- as it recognized it should -- the majority skips to "determin[ing] if [the] agency action is based on a determination of nationwide scope or effect, [by] examin[ing] the geographical aspects of the factual and analytical circumstances of the agency's determination." *Ante* at 9. This misguided analysis conflates the two distinct steps that the majority purports to recognize.

Until very recently, federal courts across the country have universally agreed that "court[s] need look only to the face of the agency action, not its practical effects, to determine whether an action is nationally applicable." *Sierra Club v. EPA* 926 F.3d 844, 849 (D.C. Cir. 2019); *see Southern Ill. Power Coop. v. EPA*, 863 F.3d 666, 670–71 (7th Cir. 2017) (determining that a "final rule of broad geographic scope containing air quality attainment designations covering 61 geographic areas across 24 states" was nationally applicable, even where the petitioners challenged only the designations related to their state); *ATK Launch Sys., Inc. v. EPA.*, 651 F.3d 1194, 1197 (10th Cir. 2011) ("The language of the Clean Air Act provision makes clear that this court must analyze whether the

19

regulation itself is nationally applicable, not whether the effects complained of or the petitioner's challenge to that regulation is nationally applicable."); *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1372–73 (11th Cir. 2023) (looking to "the face of the challenged EPA action," an allocation notice, and determining that it was nationally applicable because it "assign[ed] allowances to firms nationwide" that were "not geographically restricted"). Each of these cases holds that "venue depends entirely on—and is fixed by—the nature of the agency's action; the scope of the petitioner's challenge has **no role** to play in determining venue." *Southern Ill. Power Coop.*, 863 F.3d at 670 (emphasis supplied). To hold otherwise encourages forum shopping and is at odds with a plain reading of the Clean Air Act venue provisions.

While this court has no prior published opinion directly on point, we have addressed whether a similar final rule was nationally applicable in an unpublished opinion. In *West Virginia Chamber of Commerce v. Browner*, 166 F.3d 336 (4th Cir. 1998), the petitioners sued the EPA Administrator, seeking to invalidate a final rule, called a SIP Call, that would have required 23 states to submit revised SIPs. There, as here, the EPA had published new ozone National Ambient Air Quality Standards, and all states were required to submit SIPs within three years. But many states were unable to complete the SIPs appropriately because they lacked important information on interstate ozone transport that the EPA had not published. Because the EPA did not complete and publish its ozone studies until after states had already filed their SIPs, the EPA issued the SIP Call declaring 23 states' SIPs inadequate and requiring revisions within one year. West Virginia challenged the SIP Call

20

in this court, and we confronted the same question there as we do today -- was the final action nationally applicable?

The EPA argued that the SIP Call was "nationally applicable" because it took a "national approach," "affect[ed] 22 states and the District of Columbia," and was "based on a common core of factual information and analyses concerning . . . numerous states." *West Virginia Chamber*, 166 F.3d 336, at *5. The petitioners, on the other hand, argued that the SIP call was local or regional "because it is nothing more than numerous separate EPA actions on state-specific implementation plans." *Id.* at *6. We rejected that argument because "the SIP Call [was] not merely action on a single [SIP] or a few state implementation plans. It represent[ed] a coordinated effort to attack a problem that ignores state boundaries, and [was] based upon a common core of information and analysis involving 37 states." *Id.* In other words, consistent with the widespread framework adopted by all other courts to have considered such an issue, we looked to the face of the SIP Call to determine that it was "nationally applicable," notwithstanding that fact that the petitioners only challenged the SIP Call as it related to West Virginia's SIP.

The same is true here. The Final Rule in this case is nationally applicable on its face -- it disapproves SIPs from 21 states across the country because those states all failed to comply with the Good Neighbor provision. The majority believes that *Browner* "provides little support" for the EPA's position because the SIP Call was "preceded by a single proposed rule covering all affected States, whereas the Final Rule here was preceded by several proposed rules individually tailored to each affected State's SIP." *Ante* at 14. But this is a distinction without a difference. The Clean Air Act does not care about *proposed*

21

rules. Rather, it directs court to consider the "final action." 42 U.S.C. § 7607(b)(1). And there is no relevant distinction between the final action, the SIP Call, in *Browner* and the Final Rule here. In each instance, the EPA set new ozone standards, reviewed each state's SIP individually to determine whether it complied with the new standard, and issued a single final rule affecting each state that did not comply.

Looking -- as we should -- "only to the face of the agency action, not its practical effects," I would hold that the Final Rule is nationally applicable. *Sierra Club v. EPA* 926 F.3d 844, 849 (D.C. Cir. 2019). I see no principled reason we should depart from this well established rule. That the Final Rule, on its face, applies to 21 states across the country is dispositive.

Nevertheless, the majority jettisons this analysis altogether and instead looks to the nature of West Virginia's challenge to hold that the Final Rule is locally applicable and not based on a determination of national scope or effect. In doing so, the majority briefly notes that it "join[s] several other circuits that have reached the same conclusion on the EPA's motions to transfer petitioners to the D.C. Circuit for review of the same EPA Final Rule." *Ante* at 15. True, other circuits have made the same decision. Tellingly, however, the majority does not rely on any of those decisions in its analysis. The Eighth Circuit provided no explanation for its decisions, instead issuing summary orders denying the motions to transfer without analysis. *See Arkansas v. EPA*, No. 23-1320 (8th Cir. Apr. 25, 2023); *Missouri v. EPA*, 23-1719 (8th Cir. May 26, 2023); *Allete, Inc. v. EPA*, No. 23-1776 (8th Cir. May 26, 2023) (Minnesota). As for the Fifth and Sixth Circuits, those decisions, too, depart from all relevant precedent without adequate justification or explanation. Those

22

courts recognized that they had previously considered the face of a final rule but believed that test was "difficult to apply when the Agency takes multiple actions in a single rule." *Texas v. EPA*, No. 23-60069, 2023 WL 7204840 at \*4 (5th Cir. Feb. 14, 2023). Therefore, they looked instead to the nature of the challenges -- the individual SIPs before them -- to determine that the EPA's decisions were locally applicable. Those decisions were unprecedented. *See Kentucky v. EPA*, No. 23-3216, slip op. at \*10–11 (6th Cir. July 25, 2023) (Cole, J., dissenting) (explaining that, in light of other case law, "limiting the 'action' to Kentucky's state-specific challenge is inappropriate" where "the scope of the regulation is much broader" and courts look to "the face of the rule, rather than [its] practical effect" (cleaned up)).

In my view, this is not a close question. The Final Rule is nationally applicable on its face. Therefore, I would hold that venue only lies with the D.C. Circuit.

Because I would hold that we must transfer the case, that would necessarily moot West Virginia's Motion to Stay. I am nonetheless compelled to respond to the majority's analysis in granting the Motion to Stay because, in my view, that analysis also defies logic. The majority opines that a stay here will not substantially injure interested parties because it is "essentially" "a short-term stay." *Ante* at 17. I am curious as to how the majority can deem the stay to be "short-term" given that the time frame for any appeal to wind its way through the judicial review process is unknown. The parties have yet to brief the merits of this case and even after briefing, the case will be reviewed and likely set for oral argument. After argument, an opinion (and any concurrence or dissent) must be drafted, and there is always the possibility that a case is reheard by the court sitting en banc. There is no telling

23

how long it could be before the case reaches a conclusion in this court.  Even then, a petition for certiorari to the Supreme Court is a possibility.  Given all of this, the time period for the stay is not only quite likely not "short-term," it is actually unknown.

Beyond that, what time period could ever be sufficiently "short-term" so as to not cause injury in this case?  Is even one day breathing air that is "harmful to human health," *Ante* at 4, 17, acceptable?

The Final Rule is nationally applicable, and a stay in this case is not in the public interest.  Therefore, I dissent from the majority opinion.